UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

AKHIL C. GUPTA,
Plaintiff,

v. C.A. No. 03-587 S

CUSTOMERLINX CORPORATION,
Defendant.

# OBJECTION TO DEFENDANT'S MOTION FOR NEW TRIAL AND JUDGMENT NOTWITHSTANDING THE VERDICT

Plaintiff objects to defendant's motions for new trial and for judgment notwithstanding the verdict. The grounds for objection are summarized in the supporting memorandum.

AKHIL C. GUPTA,
By his attorney,

John D. Deacon, Jr. (#2228)
72 Pine Street
Providence, RI 02903
Tel: (401) 272-8080
Fax: (401) 272-8195

## CERTIFICATION

I hereby certify that on this 31 day of May, 2005, I caused to be served by via first class U.S. mail a copy of the within Objection to Defendant's Motion for New Trial and Judgment Notwithstanding the Verdict to attorney Michael Farley, Morrison Mahoney & Miller, One Providence Washington Plaza, Providence, R.I. 02903.

F:\John D\AKHIL GUPTA\Obj to motion for new trial.doc

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| AKHIL C. GUPTA,<br>Plaintiff, | : | |
| v. | : | C.A. No. 03-587 S |
| CUSTOMERLINX CORPORATION,<br>Defendant. | : | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION**
**TO DEFENDANT'S MOTION**
**FOR NEW TRIAL AND JUDGMENT**
**NOTWITHSTANDING THE VERDICT**

In disregard of the obligation to cite controlling authority in the relevant jurisdiction, defendants have not cited any First Circuit cases governing the standard for granting a motion for new trial. The applicable standard is as follows:

> A district court may set aside a jury's verdict and order a new trial only if the verdict is so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice.

Rivera Castillo v. Auto Kirey, Inc., 379 F.3d 4, 13 (1st Cir. 2004); Cigna Fire Underwriters Co. v. McDonald & Johnson, Inc., 86 F.3d 1260, 1263 (1st Cir. 1996); Lama v. Boras, 16 F.3d 473, 477 (1st Cir. 1994); Federico v. Order of Saint Benedict, 64 F.3d 1,5 (1st Cir. 1995)(emphasis added).

> "[T]he district court judge 'cannot displace a jury's verdict merely because he disagrees with it or would have found otherwise in a bench trial.' 'The mere fact that a contrary verdict may have been equally -- or even more easily -- supportable furnishes no cognizable ground for granting a new trial.'"

Ahern v. Scholz, 85 F.3d 774, 780 (1st Cir. 1996). (citations omitted)

## ARGUMENT

### 1a. The Jury Verdict On Plaintiff's Fraud Claim Was Supported By The Weight of the Evidence.

Defendant's listing of the elements of fraud is not accurate for purposes of this motion. Defendant appears to be attempting to create error in an effort to fabricate an issue on appeal. Defendant's present motion for new trial must be addressed and analyzed in the context of the jury instructions that were in fact given by the Court. As to the elements of fraud, the Court at page 20 of the jury instructions gave defendant's requested jury instruction no. 33 (copies attached as tab 1), which is essentially a negligent misrepresentation instruction, as follows:

> The plaintiff must prove that
>
> (1) the defendant made a false representation or provided false information concerning existing facts/circumstances;
>
> (2) that the representation/information was false at the time it was made;
>
> (3) that the defendant knew or should have known that the information was to be relied upon by the plaintiff in a business transaction;
>
> (4) that the defendant failed to exercise reasonable care in obtaining or communicating the information in question;
>
> (5) that the plaintiff did rely on the false representation/information;
>
> (6) that the plaintiff's reliance on the false representation/information was reasonable under the circumstances; and
>
> (7) that the plaintiff suffered some financial loss or harm as a proximate result of the representation/information.

In contrast, the listing of elements of a fraud claim as set forth in defendant's motion for new trial comes from plaintiff's requested instruction no. 3, to which defendant objected as being obviated by defendant's requested instruction no. 33, the negligent misrepresentation instruction

quoted above. A copy of defendant's objection on this point is attached at tab 2. Consequently, the jury was never instructed that the plaintiff had to prove that defendant intended to deceive the plaintiff. Rather, this case was instructed to the jury as a negligent misrepresentation claim, and the defendant never objected to the jury instructions in this regard. In addition, defendant does not raise or assert alleged error in the jury instructions as a ground of its motion for new trial.

The misrepresentations at issue all were made by Customerlinx for the purpose and with the intent of recruiting the plaintiff into employment with Customerlinx. Therefore, the applicable standard is, as the Court instructed, whether there was sufficient evidence to support the jury's finding "3. that the defendant [Customerlinx] knew or should have known that the information [provided to the plaintiff Gupta] was to be relied upon by the plaintiff [Gupta] in a business transaction."

Argument as to each of the five alleged misrepresentations is set forth below. It is not necessary that plaintiff have proved every one of the five alleged misrepresentations. Proof of any one was sufficient to support the verdict on the misrepresentation claim. Nonetheless, each of the five misrepresentations was proved by substantial evidence.

1. **<u>The representation that Customerlinx was cash-flow positive as of December 2000</u>.**

Defendant admits the uncontradicted evidence that the statement was made, that it was material, and that it was false. The evidence was also uncontradicted that the statement was made for the purpose and with the intent of inducing Gupta to enter into employment with Customerlinx. Even had the jury instructions required proof of intent to deceive as an element of the claim, such evidence would amply support an inference of intent to deceive. It also amply supports proof of the element as to which the jury was instructed: that the defendant knew or

should have known that the information was to be relied upon by the plaintiff in a business transaction.

2. **$6 million in new capital, to be budgeted $1.5 million to marketing, $1.5 million to sales, and $3 million to construction of a new facility.**

Defendant admits that the statement was made to Gupta prior to his hiring. Defendant also admits that this representation turned out to be false: that Customerlinx' financial condition was so deteriorated that the $6 million could not be applied as represented. In fact, a total of only $800,000 was budgeted for sales and marketing together ($400,000 to each).

This is a forward-looking misrepresentation of intention or promise. The key issue is whether, at the time the statement of intention/promise was made, Customerlinx knew or should have known that it probably could not be performed. According to its financial statements, Customerlinx had had $4.1 million in negative cash flow in year 2000 ($3.7 million negative for January through November 2000), and this negative cash flow continued into 2001. The $6 million in new capital was in fact applied almost entirely to offset this negative cash flow from year 2000. It is reasonable to infer that Customerlinx knew as of December 2000 that this would be the case. For January through November 2000, Customerlinx had negative cash of $3.7 million.

3. **The representations regarding the bonus plan.**

These misrepresentations are governed by the Court's instruction (at p. 26) regarding the affirmative duty to disclose subsequently acquired information. Within a matter of days after these misrepresentations had been made to Gupta, the action of the Customerlinx Board of Directors rendered them false in the following respects:

- Customerlinx would not have a bonus plan with any individual performance component

- Customerlinx would not be restructuring the bonus plan for 2001

- as to the company performance component, the Board directed that no bonus would be paid to any employee until after the company had been cash flow positive for at least one full year

- that there would be no quarterly payment of bonus

- that, contrary to McDermott's desire, there would not be any comprehensive, written bonus plan expressly setting forth rules and criteria for qualifying for bonus

- the initial misrepresentations were continued and compounded by McDermott's subsequent repeated statements to Gupta, "I owe you a bonus plan."

All the misrepresentations regarding the supposed bonus plan were made with the intent of inducing Gupta to enter the employment contract, and to enter and remain in the employment of Customerlinx.

**4. <u>That Customerlinx had a multi-mode technology platform fully implemented</u>.**

McDermott admitted that the topic was discussed. Gupta's testimony regarding the statements made to him was not contradicted. This is another situation involving a half-truth, which was more deceiving than a whole lie. Customerlinx only had the multi-mode technology platform fully installed at a couple of demonstration seats in two of its call centers. These demonstration seats were used to deceive customers into committing to orders. But multi-mode technology was not implemented on anything close to a scale that could actually serve the customers after sales were closed.

Customerlinx' ruse deceived Gupta just as it deceived the customers, Gupta did not discover this fraud until March of 2002, more than a year after commencement of his employment. Because the ruse succeeded in deceiving customers, Customerlinx and Gupta were able to close sales to customers. However, Customerlinx' failure and inability to fully implement a multi-mode technology platform on a functional operating basis, rather than merely an isolated desktop

demonstration basis, substantially impaired Customerlinx' ability to retain customers and grow. For example, Customerlinx lost most of its business from its two largest customers in the first half of 2001.

McDermott admitted that, as of the date of termination of his employment with Customerlinx in December 2003, it still did not have a multi-mode technology platform in place.

5. **Orders already in hand in December 2000 achieved Customerlinx' year 2001 targets for revenue and profitability, even without addition of any new customers.**

Mr. Gupta's testimony on these points was uncontradicted at trial. Defendant's motion for new trial does not address these points. The truth was that Customerlinx did not have such orders, but merely expressions of interest which never materialized into orders or sales.

The result of all the misrepresentations by McDermott painted an overall picture of Customerlinx as successful, growing, financially solid, technologically advanced, and thereby providing a very high likelihood of Mr. Gupta receiving the full bonus compensation provided by his written contract. However, the truth was that Customerlinx was a failing, money-losing, turnaround situation, unable to surmount the financial and technical obstacles to implementing the multi-mode technology platform that was its key selling point. Customerlinx' Board had effectively vetoed the implementation of any bonus plan or the payment of any bonuses. The truth was that, contrary to the picture painted by the misrepresentations, there was effectively zero likelihood of Mr. Gupta receiving any of the bonus compensation provided by his contract.

The applicable measure of damages on the misrepresentation claim was the "benefit of the bargain," as instructed by the Court at p. 53 of the Jury Instructions. This "measure protects the plaintiff's expectancy interest, giving the plaintiff the benefit of what was promised. The plaintiff is allowed to recover the difference between the actual value of what he has received

[which in regard to bonus compensation was zero] and the value it would have had if it had been as represented." Id.

As instructed by the Court at p. 52, plaintiff was not required to establish the loss or the amount of the loss with certainty. Plaintiff was merely required to provide some rational model of how the loss occurred and on what basis it has been computed. That requirement was clearly satisfied here.

The jury's verdict reflects a finding that, if the situation at Customerlinx had been as represented to Gupta, then more probably than not he would have earned the year 2001 bonus of $125,000 as provided by the written contract. The jury probably concluded that, by the end of 2001, Mr. Gupta knew or should have known that many of the representations were untrue, and by 2002 he was no longer reasonably relying upon belief in the truth of these representations. The jury's verdict is clearly supported by substantial evidence.

**1b. The Jury Verdict On Plaintiff's Fraud Claim For Sales Commissions Was Supported by Substantial Evidence.**

Plaintiff presented four separate legal theories for recovery of sales commissions: express oral agreement; implied-in-fact agreement; and quasi-contract, i.e., implied-in-law agreement. Plaintiff only needed to prevail on any one of these theories to be entitled to sales commissions. However, each of the four theories is supported by substantial evidence.

Contrary to defendant's argument, there was substantial evidence of an express written agreement entitling plaintiff to commissions on the RCA sale. This was the email sent by McDermott in the Fall of 2001, stating that sales commissions would be paid to any employee who made a sale, without excluding or excepting officers. Although Customerlinx failed to produce this document in discovery, and such improper withholding prevented the document

from being introduced into evidence, the existence of the document was amply proved by testimony of both McDermott and Gupta.

As for an oral agreement, Gupta's testimony was that there was an express oral agreement reached in February of 2002 with McDermott, in New York, that Gupta would be entitled to a sales commission if the sale of the RCA contract were closed.

Although Gupta candidly admitted that there was no final agreement from McDermott as to the percentage rate, any such gap in the agreement could be filled by evidence of Customerlinx' customary practice regarding payment of sales commissions, as instructed by the Court at pp. 48-49 of the Jury Instructions. As to the issue of payment in stock options rather than cash, this topic did not arise until McDermott initiated it in late March of 2002, after the oral agreement for commissions had been made and after the sale of the RCA contract had closed.

As to implied-in-fact modification for sales commissions, there was substantial evidence to support the elements as instructed by the Court at p. 42 of the Jury Instructions. Perhaps the strongest pieces of evidence in this regard are the evidence of Customerlinx' customary practice that a sales commission was paid on every sale, and the stipulation that Customerlinx in fact paid a sales commission on every sale in except the sale of the RCA Contract. As for the evidence of Gupta succeeding Delaney as the sales person assigned to the Kelly relationship and the RCA deal, the evidence was that Delaney would have been entitled to a sales commission after having been demoted from Vice President of the Sales Department of salesperson. McDermott's testimony that Delaney's contract did not provide for sales commissions referred to Delaney's contract as Vice President of Sales; this did not apply to his subsequent demotion to sales person. In any event, Gupta was Delaney's boss at that point, Gupta was the head of the Sales

Department at that point, and Gupta testified that Delaney like all other salespersons would have been entitled to commissions on sales.

As for quantum meruit, there was substantial evidence to satisfy the elements as instructed by the Court at pp. 44-46 of the Jury Instructions. Contrary to defendant's argument, it was undisputedly shown, by uncontradicted and overwhelming evidence, that the sales position to which McDermott assigned Gupta after Delaney's resignation in July 2001 had not been included in Gupta's duties under the initial written employment agreement. Rather, the salesperson position was a second modification to the initial employment agreement. Therefore, the compensation terms of the initial employment agreement did not cover the services provided by Gupta in the salesperson position.

**2. The Damages Awarded By The Jury Were Not Excessive.**

The damages awarded by the jury were not excessive. As to the damages on the misrepresentation claim, plaintiff incorporates the discussion above at pp. 6-7 of this memorandum. The evidence would have supported the jury awarding damages for bonus for both 2001 and 2002, which would have been a total of $275,000. The jury limited its damages award to bonus compensation for 2001, $125,000, which was less than half the amount that the jury could have awarded.

As to the damages awarded for sales commissions, defendant's argument is totally frivolous. The uncontradicted evidence was that the first twelve months' gross revenues on the RCA contract was $6.2 million. The jury awarded sales commission damages at the rate of 2%, for a total of $124,000. This damages award was amply supported by substantial evidence under any and all of the four legal theories presented on this claim.

3. **Plaintiff's Claim For Sales Commissions Is Not Barred By The Statute of Frauds.**

Defendant's asserted motion for judgment as a matter of law related solely to the claim for sales commissions. It has no bearing upon the fraud claim for bonus.

Defendant's sole ground for its motion for judgment as a matter of law was that the initial employment contract allegedly was required to be in writing by the "one year" provision of the statute of frauds, and therefore any modification was also required to be in writing. The basic premise of defendant's argument is erroneous. The initial employment contract was not for any definite term, and was expressly made terminable at will by either party. Either of these features takes the initial contract out of the statute of frauds. Moreover, even had the initial contract provided for a definite duration (which it did not), nonetheless the additional term providing for termination at will by either party would take the contract out of the statute of frauds. Restatement Second of Contracts, § 130 coms. (a) - (b) and illus. 5-6:

> "Under the prevailing interpretation, the enforceability of a contract under the one-year provision does not turn on the actual course of subsequent events, nor on the expectations of the parties as to the probabilities. Contracts of uncertain duration are simply excluded; the provision covers only those contracts whose performance cannot possibly be completed within a year.
>
> Illustrations:
>
> 5. A orally promises to work for B, and B promises to employ A for five years at a stated salary. . . .
>
> 6. . . . [T]he agreement provides that either party may terminate the contract by giving 30 days notice at any time. The agreement is one of uncertain duration and is not within the one-year provisions of the Statute."

This is a basic, "black-letter" rule of contract law which appears to be followed in every jurisdiction, including Rhode Island: "employment contract[s] [] for an indefinite term, terminable by either party at will, and thus could have been fully performed within a year from

the time it was made. We have held that such contracts are not obnoxious to the statute of frauds." Adams-Riker, Inc. v. Nightingale, 119 R.I. 862, 867, n.3, 383 A.2d 1042, 1045 n. 3 (1978) citing Powless v. Pawtucket Screw Company, 116 R.I. 158, 162, 352 A.2d 643, 646 (1976), and Restatement (First) of Contracts, § 198 and illus. 2, which is the predecessor of § 130 of the Second Restatement cited above. Defendant has cited no authority to the contrary, and plaintiff has not found any such contrary authority.

The two cases cited by defendant in the oral argument of its motion for judgment, Ferrera v. Carpionato Corp., 895 F.2d 818 (1st Cir. 1990), and Wagniere v. Dunnell, 73 A. 309 (R.I. 1909), are inapplicable. Both involved employment contracts for a definite term in excess of one year (Ferrera for two years, and Wagniere for three years), and neither contract was terminable at will.

Moreover, even if the statute of frauds were applicable (which it is not), it would not bar plaintiff's claims based on quantum meruit for the reasonable value of services rendered and benefit conferred. Restatement Second of Contracts, § 375; Parker v. Macomber, 17 R.I. 674, 24 A. 464 (1892); see also Longo v. Shore & Reich, Ltd, 25 F.3d 94, 97 (2nd Cir. 1994); Isaacs v. Incentive Systems, Inc., 52 A.D.2d 550, 382 N.Y.S.2d 69, 70 (1st Dep't 1976); Montgomery's Estate, 272 N.Y. 323, 327, 6 N.E.2d 40, 41 (1936). Defendant did not assert any theory for judgment as a matter of law against plaintiff's claim in quantum meruit for restitution.

Finally, as noted earlier in this memorandum, plaintiff's claim for sales commissions was supported by a written agreement -- the Fall 2001 email from McDermott which Customerlinx failed and refused to produce.

AKHIL C. GUPTA,
By his attorney,

John D. Deacon, Jr. (#2226)
72 Pine Street
Providence, RI 02903
Tel: (401) 272-8080
Fax: (401) 272-8195

## CERTIFICATION

I hereby certify that on this 31 day of May, 2005, I caused to be served by via first class U.S. mail a copy of the within Memorandum in Opposition to Defendant's Motion for New Trial and Judgment Notwithstanding the Verdict to attorney Michael Farley, Morrison Mahoney & Miller, One Providence Washington Plaza, Providence, R.I. 02903.