**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| AKHIL C. GUPTA,<br>Plaintiff, | : | |
| v. | : | C.A. No. 03-587 S |
| CUSTOMERLINX CORPORATION,<br>Defendant. | : | |

**CERTIFICATION IN SUPPORT OF PLAINTIFF'S MOTIONS FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION; AND FOR AUTHORIZATION FOR RECORDING JUDGMENT**

I, John D. Deacon, certify under penalty of perjury as follows:

1. I have represented the plaintiff on the claims in this action since September of 2002. I have personal knowledge of the following facts, except as otherwise stated.

2. According to testimony at trial, Customerlinx is on the accrual method of accounting, and therefore revenues are recorded for financial statement purposes shortly after invoices are issued.

3. According to plaintiff's trial exhibit ("Px") 8, Customerlinx' consolidated statement for year ending 12/31/02, its net sales for 2002 were $18,610,371. According to Px 29 and Px 55, slightly in excess of $3 million of Customerlinx' year 2002 revenues were on account of the RCA Contract. Therefore, for year 2002, Customerlinx had revenues of approximately $15.6 million from customers other than the RCA Contract.

4. For year 2003, according to Customerlinx' consolidated financial statement for that year (which it filed in May 2004 in opposition to plaintiff's motion for attachment, and a copy of which is attached hereto, tab 1), Customerlinx' net sales were $20,243,679. According to Px55, the Kelly document production and summary, for year 2003 Customerlinx invoiced a

total of slightly more than $6,670,000 on the RCA Contract. Therefore, for year 2003, Customerlinx had revenues of approximately $13.6 million from customers other than the RCA Contract, a decline of about $2 million from the previous year.

5. For year 2004, according to Customerlinx' Forecast/Plan for that year dated 5/17/04 (which it filed in May 2004 in opposition to plaintiff's motion for attachment, and a copy of which is attached hereto (tab 2), Customerlinx' forecasted sales were $11,488,647. Actual sales for 2004 are unknown. According to trial testimony, the RCA Contract was projected to provide annual sales of about $6.5 million, and invoices produced by Kelly confirm that projection. Therefore, for year 2004, Customerlinx would have had sales of approximately $5 million from customers other than the RCA Contract.

6. For year 2005, according to Customerlinx' forecast/plan for that year (tab 3), it forecast sales of $10,776,017. Subtracting the annual projected sales of $6.5 million on the RCA Contract results in projected sales of approximately $4.2 million from other customers.

7. According to trial exhibits and to the above-cited financial statements and forecasts, Customerlinx' negative cash flow and operating losses for the past five years are as follows:

| | | |
|---|---|---|
| 2000 | $4.1 million cash loss | (Px 5) |
| 2001 | $2.9 million cash loss | (Px 7) |
| 2002 | $4.7 million cash loss | (Px 8) |
| 2003 | $1.6 million cash loss | (tab 1) |
| 2004 | $775,000 actual loss through first two quarters (for 3rd and 4th quarters, actual numbers not available). (tab 2) | |

8. Attached hereto under tab 4 is a true copy of the response and production by Kelly Management Services, Inc. to a subpoena for documents which I issued and caused to be served subsequent to trial. The response is dated May 25, 2005.

9. One of the plaintiff's claims against Customerlinx that has been pursued since September of 2002 was for reimbursement of expense accounts and accrued but unused vacation time, in the aggregate amount of $10,695.26. Shortly before trial, on March 2, 2005, Customerlinx sent a check in that amount to the plaintiff. After the check was presented for deposit, it was returned for insufficient funds. After vigorous complaint, Customerlinx subsequently wired replacement funds.

10. According to trial testimony, Customerlinx closed its Rhode Island office years ago. According to an affidavit just recently received from Customerlinx on June 13, 2005, Customerlinx has closed its California operations, and has just recently sold off its Connecticut operations in early March of 2005.

11. After diligent investigation, we believe that Customerlinx has no assets physically present in Rhode Island.

Signed under penalty of perjury.

6/16/05

John D. Deacon

**CERTIFICATION**

I hereby certify that on this 16 day of June, 2005, I caused to be served by via first class U.S. mail a copy of the within Certification in Support of Plaintiff's Emergency Motion for Temporary and Preliminary Injunction in Aid of Attachment on Trustee Process and for Authorization of Amended Judgment in Other Districts to attorney Michael Farley, Morrison Mahoney & Miller, One Providence Washington Plaza, Providence, R.I. 02903.

CustomerLinx Corp.
Consolidated Statement
For the Twelve Months Ending December 31, 2003
*(unaudited)*

| | Q1 | Q2 | Q3 | Q4 | YTD | |
|---|---|---|---|---|---|---|
| ***Revenue*** | | | | | | |
| Sales | $4,657,177.58 | $5,470,661.65 | $5,212,208.66 | $4,833,197.00 | $20,173,244.89 | $0.00 |
| Other Income | $4,635.79 | $0.00 | $0.00 | $250.00 | $4,885.79 | $0.00 |
| Sales Discounts | $27,420.50 | $12,931.08 | $11,925.60 | $13,272.10 | $65,549.28 | $0.00 |
| | | | | | | $0.00 |
| ***Net Sales*** | *4,634,392.87* | *5,457,730.57* | *5,200,283.06* | *4,820,174.90* | $ *20,243,679.96* | $0.00 |
| | | | | | | $0.00 |
| COGS | $3,424,358.90 | $3,424,358.90 | $3,522,766.53 | $3,424,358.90 | $13,795,843.23 | $0.00 |
| | | | | | | $0.00 |
| ***Gross Margin*** | *1,210,033.97* | *2,033,371.67* | *1,677,516.53* | *1,395,816.00* | $ *6,447,836.73* | $0.00 |
| | | | | | | $0.00 |
| | | | | | | $0.00 |
| ***Operating Expenses*** | | | | | | $0.00 |
| | | | | | | $0.00 |
| **Salary Expense** | $958,957.25 | $958,957.25 | $864,434.66 | $958,957.25 | $3,741,306.41 | $0.00 |
| **Property and Liability Insurance** | $0.00 | $43,538.07 | $50,866.85 | $66,654.51 | $161,059.43 | $0.00 |
| **Rent Expense** | $290,294.32 | $290,294.32 | $276,776.55 | $282,803.21 | $1,140,168.40 | $0.00 |
| **Licensing and Software Fees** | $155,216.17 | $102,793.93 | $266,064.66 | $85,128.00 | $609,202.76 | $0.00 |
| **Employee Benefits Expense** | $82,938.50 | $224,206.35 | $84,798.68 | $95,670.12 | $487,613.65 | $0.00 |
| **Utilities** | $71,341.89 | $60,709.18 | $108,532.44 | $52,312.65 | $292,896.16 | $0.00 |
| **Long Distance Telephone Service** | $52,427.39 | $56,796.19 | $54,424.21 | $86,451.74 | $250,099.53 | $0.00 |
| **Office Expense** | $42,960.21 | $26,620.55 | $28,563.36 | $28,094.80 | $126,238.92 | $0.00 |
| Repair and Maintenance | $42,128.09 | $48,442.52 | $52,391.72 | $60,507.45 | $203,469.78 | $0.00 |
| Legal Fees | $49,691.69 | $2,636.54 | $16,699.17 | $40,851.84 | $109,879.24 | $0.00 |
| Equipment Rental | $40,597.12 | $40,597.12 | $48,048.12 | $27,802.11 | $157,044.47 | $0.00 |
| Payroll Processing Fees | $29,183.82 | $29,183.82 | $0.00 | $0.00 | $58,367.64 | $0.00 |
| Systems Maintenance | $24,720.96 | $17,170.35 | $10,886.48 | $19,949.34 | $72,727.13 | $0.00 |
| Local Telephone Service | $14,818.96 | $40,171.36 | $16,088.36 | $25,202.82 | $96,281.50 | $0.00 |
| Consulting | $14,412.50 | $2,412.94 | $60,774.29 | $45,052.33 | $122,652.06 | $0.00 |
| Express Mail and Courier Service | $7,358.48 | $7,358.48 | $0.00 | $0.00 | $14,716.96 | $0.00 |
| **Mobile Telephone Service** | $8,221.29 | $8,221.29 | $0.00 | $0.00 | $16,442.58 | $0.00 |
| Postage Expense | $3,980.62 | $3,980.62 | $4,500.00 | $4,500.00 | $16,961.24 | $0.00 |
| Travel Expense | $11,878.53 | $14,646.79 | $7,686.53 | $18,485.48 | $52,697.33 | $0.00 |
| **Web Site Development** | $3,833.34 | $3,852.25 | $3,836.07 | $2,649.80 | $14,171.46 | $0.00 |
| Bank Service Charges | $2,376.96 | $0.00 | $10.00 | $0.00 | $2,386.96 | $0.00 |
| Dues and Subscriptions | $1,289.90 | $338.03 | $317.45 | $0.00 | $1,945.38 | $0.00 |
| Recruiting | $2,506.36 | $2,915.60 | $0.00 | $0.00 | $5,421.96 | $0.00 |
| Company Vehicle Expenses | $1,803.64 | $2,271.01 | $1,435.24 | $877.23 | $6,387.12 | $0.00 |
| **Accounting and Auditing** | $1,118.31 | $9,937.50 | $49,250.00 | $15,418.30 | $75,724.11 | $0.00 |
| **Corporate Filing Fees** | $599.25 | $1,563.25 | $2,027.70 | $3,880.75 | $8,070.95 | $0.00 |
| **Property Tax/CAM Charges** | $862.22 | $14,833.19 | $5,379.41 | $15,146.14 | $36,220.96 | $0.00 |
| **Miscellaneous Expense** | $2,521.00 | $294.90 | $0.00 | $0.00 | $2,815.90 | $0.00 |
| **Outside Services** | $686.40 | $6,459.28 | $912.60 | $609.00 | $8,667.28 | $0.00 |
| **Temporary Employment Services** | $67.50 | $44,601.30 | $12,138.62 | $0.00 | $56,807.42 | $0.00 |
| **Charitable Contributions** | $1,000.00 | $1,000.00 | $0.00 | $49.00 | $2,049.00 | $0.00 |
| Advertising Expense | $104.00 | $615.02 | $345.50 | $544.30 | $1,608.82 | $0.00 |
| | | | | | | $0.00 |
| ***Total Operating Expenses*** | *1,919,896.67* | *2,067,419.00* | *2,027,188.67* | *1,937,598.17* | $ *7,952,102.51* | $0.00 |
| ***Income From Operations*** | *(709,862.70)* | *(34,047.33)* | *(349,672.14)* | *(541,782.17)* | ($1,635,364.34) | $0.00 |
| | | | | | | $0.00 |
| Interest Income | $164.10 | $0.00 | $0.00 | $0.00 | $164.10 | $0.00 |
| | | | | | | $0.00 |
| ***Income Before Depreciation and Income Taxes*** | *(709,698.60)* | *(34,047.33)* | *(349,672.14)* | *(541,782.17)* | ($1,635,200.24) | $0.00 |
| Depreciation Expense | $0.00 | $43,393.00 | $28,771.12 | $49,681.94 | $121,846.06 | $0.00 |
| Income Tax Expense | $22,217.00 | $3,969.67 | $0.00 | $0.00 | $26,186.67 | $0.00 |
| | | | | | | $0.00 |
| ***Net Income*** | ***($687,481.60)*** | ***$13,315.34*** | ***($320,901.02)*** | ***($492,100.23)*** | ***($1,487,167.51)*** | $0.00 |

CONFIDENTIAL

## CustomerLinx 2005 Forecast/Plan as of February 25, 2004

| CustomerLinx | Jan-05 | Feb-05 | Mar-05 | Apr-05 | May-05 | Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 | Nov-05 | Dec-05 | 2005 | 1Q 2005 | 2Q 2005 | 3Q 2005 | 4Q 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | | | | | | | | | |
| Oklahoma | 630,517 | 596,140 | 494,764 | 571,539 | 592,235 | 611,231 | 616,231 | 616,231 | 616,231 | 639,231 | 637,231 | 637,231 | 7,258,812 | 1,721,421 | 1,775,005 | 1,848,693 | 1,913,693 |
| New York CC | 223,906 | 223,494 | 238,239 | 210,698 | 238,600 | 245,400 | 239,400 | 243,900 | 257,400 | 259,400 | 254,400 | 249,400 | 2,884,237 | 685,639 | 694,698 | 740,700 | 763,200 |
| New York Tax and Ins. | 19,141 | 18,198 | 25,242 | 44,655 | 35,500 | 40,500 | 16,500 | 100,500 | 24,500 | 16,500 | 15,500 | 55,500 | 412,236 | 62,581 | 120,655 | 141,500 | 87,500 |
| Connecticut | 65,732 | 45,000 | 55,000 | 6,875 | 6,875 | 6,875 | 6,875 | 6,875 | 6,875 | 6,875 | 6,875 | - | 220,732 | 165,732 | 20,625 | 20,625 | 13,750 |
| **Total Revenues** | 939,296 | 882,832 | 813,245 | 833,767 | 873,210 | 904,006 | 879,006 | 967,506 | 905,006 | 922,006 | 914,006 | 942,131 | 10,776,017 | 2,635,373 | 2,610,983 | 2,751,518 | 2,778,143 |
| **Expenses** | | | | | | | | | | | | | | | | | |
| Staffing - Direct Expense | | | | | | | | | | | | | | | | | |
| Oklahoma | 263,428 | 255,969 | 217,110 | 217,458 | 240,854 | 243,104 | 256,029 | 246,029 | 256,029 | 246,029 | 245,129 | 245,129 | 2,932,297 | 736,507 | 701,416 | 758,087 | 736,287 |
| New York CC | 137,893 | 134,513 | 146,930 | 133,039 | 160,884 | 160,884 | 191,884 | 199,696 | 195,884 | 195,884 | 195,884 | 195,884 | 2,049,259 | 419,336 | 454,807 | 587,464 | 587,652 |
| New York Tax and Ins. | 7,641 | 7,641 | 7,641 | 7,567 | 7,567 | 7,567 | 7,641 | 7,641 | 7,641 | 7,641 | 7,641 | 7,641 | 91,471 | 22,924 | 22,701 | 22,923 | 22,923 |
| Connecticut | 15,641 | 15,641 | 15,641 | - | - | - | - | - | - | - | - | - | 46,923 | 46,923 | - | - | - |
| Corporate | | | | | | | | | | | | | - | - | - | - | - |
| Total Direct Staffing | 424,603 | 413,764 | 387,322 | 358,064 | 409,305 | 411,555 | 455,554 | 453,366 | 459,554 | 449,554 | 448,654 | 448,654 | 5,119,950 | 1,225,690 | 1,178,924 | 1,368,474 | 1,346,862 |
| Staffing - Indirect Expense | | | | | | | | | | | | | | | | | |
| Oklahoma | 79,781 | 77,359 | 79,953 | 76,709 | 80,050 | 80,050 | 80,050 | 80,050 | 80,050 | 80,050 | 80,050 | 80,050 | 954,202 | 237,093 | 236,809 | 240,150 | 240,150 |
| New York | 43,933 | 38,039 | 38,039 | 38,039 | 38,039 | 38,039 | 38,039 | 38,039 | 38,039 | 38,039 | 38,039 | 38,039 | 462,364 | 120,011 | 114,118 | 114,118 | 114,118 |
| Connecticut | 25,736 | 25,737 | 25,737 | 28,000 | - | - | - | - | - | - | - | - | 105,210 | 77,210 | 28,000 | - | - |
| Corporate | 45,544 | 45,544 | 47,544 | 48,044 | 48,044 | 48,044 | 29,076 | 29,076 | 29,076 | 28,500 | 28,500 | 28,500 | 455,494 | 138,633 | 144,133 | 87,228 | 85,500 |
| Total Indirect Staffing | 194,994 | 186,679 | 191,273 | 190,793 | 166,134 | 166,134 | 147,165 | 147,165 | 147,165 | 146,589 | 146,589 | 146,589 | 1,977,270 | 572,947 | 523,060 | 441,496 | 439,768 |
| Occupancy | | | | | | | | | | | | | | | | | |
| Oklahoma | 27,768 | 26,903 | 26,666 | 26,903 | 27,133 | 27,350 | 29,133 | 29,236 | 29,736 | 29,736 | 28,736 | 27,236 | 336,536 | 81,337 | 81,386 | 88,105 | 85,708 |
| New York CC | 25,811 | 29,428 | 27,331 | 24,968 | 26,039 | 26,039 | 25,939 | 25,939 | 25,939 | 25,939 | 25,089 | 25,089 | 313,550 | 82,570 | 77,046 | 77,817 | 76,117 |
| New York Tax and Ins. | 3,600 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 45,400 | 11,200 | 11,400 | 11,400 | 11,400 |
| Connecticut | 17,328 | 17,050 | 17,050 | 8,738 | - | - | - | - | - | - | - | - | 60,166 | 51,428 | 8,738 | - | - |
| Total Occupancy | 74,507 | 77,181 | 74,847 | 64,409 | 56,972 | 57,189 | 58,872 | 58,975 | 59,475 | 59,475 | 57,625 | 56,125 | 755,652 | 226,535 | 178,570 | 177,322 | 173,225 |
| Telecom/Connectivity/CoGS | | | | | | | | | | | | | | | | | |
| Oklahoma | 74,132 | 80,987 | 76,683 | 75,428 | 105,800 | 105,800 | 105,800 | 105,800 | 105,800 | 105,800 | 105,800 | 105,800 | 1,153,630 | 231,802 | 287,028 | 317,400 | 317,400 |
| New York CC | 32,126 | 29,292 | 31,039 | 33,840 | 34,054 | 34,204 | 34,054 | 40,954 | 34,054 | 34,054 | 34,204 | 34,254 | 406,129 | 92,457 | 102,098 | 109,062 | 102,512 |
| New York Tax and Ins. | 552 | 552 | 752 | 552 | 2,602 | 2,602 | 1,602 | 10,602 | 2,102 | 1,602 | 1,602 | 5,602 | 30,724 | 1,856 | 5,756 | 14,306 | 8,806 |
| Connecticut | 11,307 | 6,210 | 4,500 | - | - | - | - | - | - | - | - | - | 22,017 | 22,017 | - | - | - |
| Corporate | | | | | | | | | | | | | - | - | - | - | - |
| Total Telecom | 118,117 | 117,041 | 112,974 | 109,820 | 142,456 | 142,606 | 141,456 | 157,356 | 141,956 | 141,456 | 141,606 | 145,656 | 1,612,500 | 348,132 | 394,882 | 440,768 | 428,718 |
| Other Expense | | | | | | | | | | | | | | | | | |
| Oklahoma | 11,949 | 8,225 | 12,037 | 11,741 | 14,825 | 14,825 | 14,825 | 14,825 | 14,825 | 14,825 | 14,825 | 14,825 | 162,552 | 32,211 | 41,391 | 44,475 | 44,475 |
| New York CC | 4,772 | 3,912 | 5,229 | 3,134 | 10,780 | 9,842 | 4,864 | 7,232 | 4,378 | 3,982 | 4,410 | 4,410 | 66,945 | 13,913 | 23,756 | 16,474 | 12,802 |
| Connecticut | 1,016 | 2,843 | 2,093 | 361 | 376 | - | - | - | - | - | - | - | 6,689 | 5,952 | 737 | - | - |
| Corporate | 19,750 | 29,750 | 32,350 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 13,750 | 13,750 | 240,600 | 81,850 | 56,250 | 56,250 | 46,250 |
| Total Other Expense | 37,487 | 44,730 | 51,709 | 33,986 | 44,731 | 43,417 | 38,439 | 40,807 | 37,953 | 37,557 | 32,985 | 32,985 | 476,786 | 133,926 | 122,134 | 117,199 | 103,527 |
| **Total COGS** | 617,227 | 607,987 | 575,143 | 532,293 | 606,733 | 611,350 | 655,882 | 669,697 | 660,985 | 650,485 | 647,885 | 650,436 | 7,488,103 | 1,800,358 | 1,762,376 | 1,986,564 | 1,948,805 |
| **Gross Profit** | 322,069 | 274,845 | 238,102 | 301,474 | 264,477 | 292,656 | 223,124 | 297,809 | 244,021 | 271,521 | 266,121 | 291,696 | 3,287,915 | 835,016 | 858,607 | 764,954 | 829,338 |
| Gross Margin (incl. occpancy) | 34.29% | 31.13% | 29.28% | 36.16% | 30.29% | 32.37% | 25.38% | 30.78% | 26.96% | 29.45% | 29.12% | 30.96% | 30.51% | | | | |
| **Total Other Expense** * | 232,481 | 231,409 | 242,982 | 224,779 | 210,865 | 209,551 | 185,604 | 187,972 | 185,118 | 184,146 | 179,574 | 179,574 | 2,454,056 | 706,873 | 645,194 | 558,695 | 543,295 |
| **Total Expense** | 849,709 | 839,396 | 818,126 | 757,072 | 819,598 | 820,901 | 841,486 | 857,669 | 846,103 | 834,631 | 827,459 | 830,009 | 9,942,158 | 2,507,231 | 2,397,570 | 2,545,259 | 2,492,100 |
| **Net Income** | 89,587 | 43,436 | (4,881) | 76,695 | 53,612 | 83,105 | 37,520 | 109,837 | 58,903 | 87,375 | 86,547 | 112,122 | 833,859 | 128,143 | 213,413 | 206,259 | 286,043 |
| | 9.54% | 4.92% | -0.60% | 9.20% | 6.14% | 9.19% | 4.27% | 11.35% | 6.51% | 9.48% | 9.47% | 11.90% | 7.74% | 4.86% | 8.17% | 7.50% | 10.30% |

Other Expense includes Indirect Staffing and miscellaneous other expenses

| CustomerLinx | 1Q 2004 | 2Q 2004 | 3Q 2004 | 4Q 2004 |
|---|---|---|---|---|
| **Revenues** | | | | |
| New York | 1,259,189 | 851,677 | 1,046,655 | 1,198,124 |
| Oklahoma | 1,128,633 | 1,257,687 | 1,394,290 | 1,399,290 |
| Connecticut | 413,644 | 438,080 | 456,177 | 453,097 |
| California | 107,448 | 84,656 | - | - |
| **Total Revenues** | **2,908,914** | **2,632,100** | **2,897,122** | **3,050,511** |
| **Expenses** | | | | |
| Staffing - Direct Expense | | | | |
| New York | 938,654 | 537,528 | 720,646 | 896,270 |
| Oklahoma | 476,522 | 505,859 | 507,390 | 510,390 |
| Connecticut | 120,277 | 113,712 | 116,041 | 116,041 |
| California | 40,650 | 27,100 | - | - |
| Corporate | - | - | - | - |
| Total Direct Staffing | 1,576,103 | 1,184,199 | 1,344,076 | 1,522,701 |
| Staffing - Indirect Expense | | | | |
| New York | 214,425 | 147,245 | 114,723 | 114,723 |
| Oklahoma | 283,499 | 241,271 | 251,271 | 224,721 |
| Connecticut | 54,814 | 54,814 | 54,814 | 54,814 |
| Corporate | 116,478 | 115,229 | 102,729 | 102,729 |
| Total Indirect Staffing | 669,216 | 558,559 | 523,537 | 496,987 |
| Occupancy | | | | |
| New York | 218,537 | 122,122 | 88,539 | 88,539 |
| Oklahoma | 95,511 | 97,943 | 99,360 | 99,566 |
| Connecticut | 51,611 | 49,974 | 51,150 | 51,150 |
| California | 32,400 | 21,600 | - | - |
| Total Occupancy | 398,059 | 291,639 | 239,049 | 239,255 |
| Telecom/Connectivity/CoGS | | | | |
| New York | 151,331 | 98,876 | 90,003 | 90,003 |
| Oklahoma | 236,951 | 255,299 | 268,368 | 277,868 |
| Connecticut | 182,486 | 218,664 | 233,708 | 233,708 |
| California | 11,850 | 7,900 | - | - |
| Corporate | - | - | - | - |
| Total Telecom | 582,618 | 580,739 | 592,079 | 601,579 |
| Other Expense | | | | |
| New York | 36,970 | 17,305 | 12,300 | 12,300 |
| Oklahoma | 43,765 | 35,918 | 44,100 | 44,100 |
| Connecticut | 9,550 | 6,599 | 8,300 | 7,800 |
| California | - | - | - | - |
| Corporate | 148,008 | 176,808 | 152,408 | 88,008 |
| Total Other Expense | 238,293 | 236,630 | 217,108 | 152,208 |
| **Total COGS** | 2,556,780 | 2,056,577 | 2,175,204 | 2,363,535 |
| **Gross Profit** | 352,134 | 575,523 | 721,918 | 686,976 |
| Gross Margin (incl. occpancy) | | | | |
| **Total Other Expense *** | 907,509 | 795,189 | 740,645 | 649,195 |
| **Total Expense** | 3,464,289 | 2,851,766 | 2,915,849 | 3,012,730 |
| **Net Income** | (555,375) | (219,666) | (18,727) | 37,781 |
| | -19.09% | -8.35% | -0.65% | 1.24% |

Founded in 1852
by Sidney Davy Miller

MILLER CANFIELD
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

MICHIGAN: Ann Arbor
Detroit • Grand Rapids
Howell • Kalamazoo
Lansing • Monroe • Troy
New York, NY
Pensacola, FL
Washington, DC
CANADA: Windsor, ON
POLAND: Gdynia
Katowice • Warsaw

STUART M. HEATH
TEL: (248) 267-3266
FAX: (248) 267-3333
E-MAIL: heath@millercanfield.com

840 West Long Lake Road, Suite 200
Troy, Michigan 48098
TEL: (248) 879-2000
FAX: (248) 879-2001
www.millercanfield.com

May 25, 2005

**VIA FACSIMILE AND MAIL 401-272-8195**

John D. Deacon, Jr.
72 Pine Street
Providence, RI 02903

Re: Akhil C. Gupta v. Customerlinx - subpoenas to Kelley Management Services

Dear Mr. Deacon:

Please consider this letter as Kelly Management Services response to your subpoena issued May 5, 2005. The subpoena was improperly issued and served upon Kelly Management Services and is in violation of FRCP 45. Accordingly, Kelly Management Services is under no obligation to respond. As I pointed out in regard to your prior subpoenas, Michigan is not within Rhode Island, nor is it 100 miles from your office. In the future, if you wish to properly issue a subpoena within the jurisdiction of the Eastern District of Michigan, per Rule 45(a)(2), Kelly Management Services will file a formal reply. Also, your request again seeks documents generated by and in the possession of Customerlinx. As they are the defendant in your case they are the proper entity from whom to obtain those documents. Seeking defendant's documents from a non-party unnecessarily places an undue burden on Kelly Management Services and is also objectionable under Rule 45.

Notwithstanding the objections, and in the interest of cooperation, I am enclosing documents responsive to your requests. In response to Request No. 1, see the attached "invoices" received by Kelly Management Services for which Customerlinx has assigned due dates in May and June of 2005. By providing such invoices, Kelly Management Services is in no way attesting to the accuracy of the invoices. In fact, it is Kelly Management Services' position that the invoices provided by Customerlinx are not accurate.

Also enclosed, in response to Request No. 2, is a copy of Kelly Management Services, Inc.'s Answer and Counterclaim filed with the American Arbitration Association. As you will see from that document, the amount owed to Customerlinx is currently in dispute. Further any ongoing contractual payments to Customerlinx are subject to Kelly Management Services' right to setoff.

Finally, as for your Request No. 3, Kelly Management Services and Customerlinx have no other contractual relationships aside from the "Alliance Agreement" and "Amendment A" and accordingly there are no "accounts payable to defendant Customerlinx on account of any other matter."

If you have any questions, please feel free to contact me.

Very truly yours,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: ______________________
Stuart M. Heath

SMH/ljs

Enclosures

cc: Frank L. Andrews

112722.1\047265-00017

CustomerLinx

**Invoice # 1866**

*******REVISED*******

1250 W Main Street
Durant, OK 74701
(888) 858-8849 Voice
(580) 931-9046 Fax

# Invoice

| | | | |
|---|---|---|---|
| Name: | **Kelly Management Services** | Date | **April 4, 2005** |
| Address: | **Attn: Jeff Warnecke** | Service | |
| | **999 West Big Beaver Road** | Date(s) | **Feb 28 - Apr 3, 2005** |
| City: | **Troy, MI 48084** | | |
| Phone: | **248.506.4199** | Due Date | **May 19, 2005** |

| Quantity | Description | Unit Price | Total |
|---|---|---|---|
| | Thomson Inc. | | |
| 675706.80 | Inbound Minutes | $0.636 | $ 429,749.52 |
| 27282.67 | Outbound Minutes | $0.636 | $ 17,351.78 |
| 149315.63 | Email Minutes | $0.636 | $ 94,964.74 |
| 1924.70 | DID Inbound Minutes | $0.636 | $ 1,224.11 |
| | | SubTotal | $ 543,290.15 |
| | | TOTAL | $ 543,290.15 |

*Net Forty Five Days*

## Thank You for Your Business!!!!!!!

***Please Remit To:*** ***CustomerLinx***
***1250 W Main Street***
***Durant, OK 74701***

***Wiring Information:*** ***ABA# 026009593 Bank of America***
***Acct# 003280509565 Atlanta, GA***

CustomerLinx

Invoice # 1867

1250 W Main Street
Durant, OK 74701
(888) 858-8849 Voice
(580) 931-9046 Fax

# Invoice

| | | | |
|---|---|---|---|
| Name: | Kelly Management Services | Date | April 1, 2005 |
| Address: | Attn: Jeff Warnecke | Service Date(s) | March 2005 |
| | 999 West Big Beaver Road | | |
| City: | Troy , MI 48084 | | |
| Phone: | 248.506.4199 | Due Date | May 16, 2005 |

| Quantity | Description | Unit Price | Total |
|---|---|---|---|
| | Thomson Inc. | | |
| | Facility Management Fee - March 2005 | | $112,500.00 |
| | 0 - 30 Days | | $112,500.00 |
| | 31 - 60 Days | | $59,350.74 |
| | 61 - 90 Days | | $0.00 |
| | Finance Charge on Past Due Balance | | $504.30 |
| | | SubTotal | $284,855.04 |
| | | TOTAL | $284,855.04 |

*Net Forty Five Days*

**Thank You for Your Business!!!!!!!**

*Please Remit To:* ***CustomerLinx***
***62 Spring Lane***
***Farmington, CT 06032***

| | | | |
|---|---|---|---|
| *Wiring Information:* | *ABA#* | *011900571* | Fleet Bank |
| | *Acct#* | *9472978753* | Farmington, CT |

CustomerLinx

Invoice # 1868

*****REVISED*****

1250 W Main Street
Durant, OK 74701
(888) 858-8849 Voice
(580) 931-9046 Fax

# Invoice

| | | | |
|---|---|---|---|
| Name: | Kelly Management Services | Date | May 2, 2005 |
| Address: | Attn: Jeff Warnecke | Service Date(s) | Apr 4 - May 1, 2005 |
| | 999 West Big Beaver Road | | |
| City: | Troy, MI 48084 | | |
| Phone: | 248.506.4199 | Due Date | June 16, 2005 |

| Quantity | Description | Unit Price | Total |
|---|---|---|---|
| | Thomson Inc. | | |
| 465362.43 | Inbound Minutes | $0.636 | $ 295,970.51 |
| 22698.62 | Outbound Minutes | $0.636 | $ 14,436.32 |
| 73435.55 | Email Minutes | $0.636 | $ 46,705.01 |
| 1292.75 | DID Inbound Minutes | $0.636 | $ 822.19 |
| 2.5 | Programming Hours - Gyration | $75.00 | $ 187.50 |
| | | SubTotal | $ 358,121.53 |
| | | TOTAL | $ 358,121.53 |

*Net Forty Five Days*

**Thank You for Your Business!!!!!!!**

***Please Remit To:*** ***CustomerLinx***
***1250 W Main Street***
***Durant, OK 74701***

***Wiring Information:***

| | | |
|---|---|---|
| ***ABA#*** | ***026009593*** | ***Bank of America*** |
| ***Acct#*** | ***003280509565*** | ***Atlanta, GA*** |

CustomerLinx™

**Invoice # 1869**

1250 W Main Street
Durant, OK 74701
(888) 858-8849 Voice
(580) 931-9046 Fax

# Invoice

| | | | |
|---|---|---|---|
| Name: | Kelly Management Services | Date | May 2, 2005 |
| Address: | Attn: Jeff Warnecke | Service | |
| | 999 West Big Beaver Road | Date(s) | April 2005 |
| City: | Troy , MI 48084 | | |
| Phone: | 248.506.4199 | Due Date | June 16, 2005 |

| Quantity | Description | Unit Price | Total |
|---|---|---|---|
| | Thomson Inc. | | |
| | Facility Management Fee - April 2005 | | $112,500.00 |
| | 0 - 30 Days | | $163,619.13 |
| | 31 - 60 Days | | $0.00 |
| | 61 - 90 Days | | $559.86 |
| | Finance Charge on Past Due Balance | | $464.51 |
| | | SubTotal | $277,143.50 |
| | | TOTAL | $277,143.50 |

*Net Forty Five Days*

**Thank You for Your Business!!!!!!!**

*Please Remit To:* ***CustomerLinx***
***62 Spring Lane***
***Farmington, CT 06032***

*Wiring Information:* ***ABA#*** *011900571* Fleet Bank
***Acct#*** *9472978753* Farmington, CT

AMERICAN ARBITRATION ASSOCIATION

AMERICAN ARBITRATION ASSOCIATION

In the matter of the Arbitration between:

**CustomerLinx Corp.,**

Claimant. Case No. 71-117 –132 05

v.

**Kelly Management Services, Inc.,**

Respondent.

_______________________________________/

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

**ANSWER AND COUNTERCLAIM FILED ON BEHALF OF KELLY MANAGEMENT SERVICES, INC., RESPONDENT AND COUNTERCLAIMANT**

**ANSWER TO DEMAND FOR ARBITRATION**

NOW COMES Kelly Management Systems, Inc. ("KMS"), Respondent, by its attorneys Miller Canfield Paddock and Stone P.L.C., and for its answer to the Demand for Arbitration filed herein says:

1. CustomerLinx represented itself as engaged in the business of providing outsourced voice and web-based Customer Relationship Management ("eCRM") Services.

2. KMS provides outsourcing solutions to its clients and in this case contracted with CustomerLinx for the purpose of procuring certain components of a call center operation needed to supply call center services to its clients.

3. On or about April 4, 2001, KMS and CustomerLinx entered into an Agreement ("Alliance Agreement") attached hereto as Exhibit 1, which sets forth the terms for the parties to cooperate in the providing of eCRM services to clients from facilities to be designed, owned and managed by CustomerLinx and staffed by personnel supplied by KMS.

4. On or about March 7, 2002, Kelly Services, Inc. ("Kelly") and CustomerLinx entered into an agreement with Thomson multimedia, Inc. ("Thomson"), entitled Management Services Agreement (the "Thomson Management Services Agreement") attached hereto as Exhibit 2, pursuant to which Kelly and CustomerLinx agreed to provide Contact Center services to Thomson.

5. Kelly and CustomerLinx are jointly referred to as the "Providers" in the Thomson Management Services Agreement.

6. On or about July 15, 2002, KMS and CustomerLinx entered into an Amendment A to the Alliance Agreement, attached hereto as Exhibit 3, which was intended to clarify the duties and obligations to each other arising from the provision of services to Thomson under the Thomson Management Services Agreement.

7. At all times herein KMS fully complied with the terms and conditions of the Alliance Agreement and Amendment A.

8. The Alliance Agreement as amended provides for the allocation between KMS and CustomerLinx of the revenues derived from performance of the obligations of the Providers under the Management Services Agreement.

9. On or about June of 2003, CustomerLinx claimed that it was experiencing severe financial difficulties that were threatening to cause CustomerLinx to close its operations facility and to default under the Alliance Agreement as amended.

10. Such a closure and default by CustomerLinx would place in serious jeopardy the performance by the Providers of their obligations under the Thomson Management Services Agreement.

11. To alleviate its claimed financial distress and avoid the threat of imminent closure of its facility, CustomerLinx demanded that KMS increase its payments to CustomerLinx over and above that amount provided in the Alliance Agreement as amended.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

12. CustomerLinx proposed that to avoid closure of the facility that the Alliance Agreement be further amended to provide for additional payments to CustomerLinx until its financial distress was relieved.

13. CustomerLinx and KMS attempted to negotiate the terms of a proposed amended agreement but were unsuccessful in reaching an agreement that was mutually acceptable.

14. Despite the fact that the parties were unable to arrive at a mutually acceptable agreement, KMS continued to make the payments to CustomerLinx as required under the terms of the Alliance Agreement and Amendment A and advanced to CustomerLinx additional funds in order that CustomerLinx could avoid closing the facility and defaulting under its agreement with Thomson.

15. In making these voluntary advances, KMS relied solely upon the representations by CustomerLinx that it was undergoing financial challenges. KMS made these advances to CustomerLinx without receiving in return any consideration from CustomerLinx.

16. When it became apparent to KMS that CustomerLinx had survived its financial difficulties, KMS discontinued its additional advances and resumed payments in accordance with the payment schedule as specified in Amendment A to the Alliance Agreement.

17. KMS expressly denies that it had any obligation to make advances to CustomerLinx greater than the amount specified under Amendment A to the Agreement and further denies that it is liable to CustomerLinx for any amount whatsoever.

**WHEREFORE,** KMS respectfully denies that CustomerLinx is entitled to any damages whatsoever and requests that this arbitrator render an award in favor of KMS of no cause of action and award to KMS its costs and attorney fees incurred in the defense of this claim.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

## COUNTERCLAIM FOR DECLARATORY JUDGMENT

Now comes KMS, by its attorneys, Miller Canfield, Paddock and Stone and for its Counterclaim for Declaratory Judgment says:

## GENERAL ALLEGATIONS

1. CustomerLinx represented itself as engaged in the business of providing outsourced voice and web-based Customer Relationship Management ("eCRM") Services.

2. KMS provides outsourcing solutions to its clients and in this case contracted with CustomerLinx for the purpose of procuring certain components of a call center operation needed to supply call center services to its clients.

3. On or about April 4, 2001, KMS and CustomerLinx entered into an Agreement ("Alliance Agreement"), attached hereto as Exhibit 1, which sets forth the terms for the parties to cooperate in the providing of eCRM services to clients from facilities to be designed, owned and managed by CustomerLinx and staffed by personnel supplied by KMS.

4. On or about March 7, 2002, Kelly Services, Inc. ("Kelly") and CustomerLinx entered into an agreement with Thomson multimedia, Inc. ("Thomson"), entitled Management Services Agreement (the "Thomson Management Services Agreement"), attached hereto as Exhibit 2, pursuant to which Kelly and CustomerLinx agreed to provide Contact Center services to Thomson.

5. Kelly and CustomerLinx are jointly referred to as the "Providers" in the Thomson Management Services Agreement.

6. On or about July 15, 2002, KMS and CustomerLinx entered into an Amendment A to the Alliance Agreement, attached hereto as Exhibit 3, which was intended to clarify the duties and obligations to each other arising from the provision of services to Thomson under the Thomson Management Services Agreement.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

7. At all times herein KMS fully complied with the terms and conditions of the Alliance Agreement and Amendment A.

8. The Alliance Agreement, as amended, provides for the allocation between KMS and CustomerLinx of the revenues derived from performance of the obligations of the Providers under the Management Services Agreement.

9. On or before the first quarter of 2003, CustomerLinx claimed that it was experiencing severe financial difficulties that were threatening to cause CustomerLinx to close its operations facility and to default under the Alliance Agreement, as amended.

10. Such a closure and default by CustomerLinx would place in serious jeopardy the performance by the Providers of their obligations under the Thomson Management Services Agreement.

11. To alleviate its claimed financial distress and avoid the threat of imminent closure of its facility, CustomerLinx demanded that KMS increase its payments to CustomerLinx over and above that amount provided in the Alliance Agreement, as amended.

12. CustomerLinx proposed that to avoid closure of the facility that the Alliance Agreement be further amended to provide for additional payments to CustomerLinx until its financial distress was relieved.

13. CustomerLinx and KMS attempted to negotiate the terms of a second amendment to the Alliance Agreement but were unsuccessful in arriving at terms that were mutually acceptable to both parties.

14. Despite the fact that the parties were unable to arrive at a mutually acceptable agreement, KMS continued to make the payments to CustomerLinx as required under the terms of the Alliance Agreement, as amended, and advanced to CustomerLinx additional funds in order that CustomerLinx could avoid closing the facility and defaulting under its agreement with Thomson.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

15. In making these voluntary advances, KMS relied solely upon the representations by CustomerLinx that it was undergoing financial distress. KMS made these advances to CustomerLinx without receiving any consideration from CustomerLinx for such advances.

16. When it became apparent to KMS that CustomerLinx had survived its financial difficulties, KMS discontinued its additional advances and resumed payments in accordance with the payment schedule as specified in Amendment A to the Alliance Agreement.

## I. DETERMINATION OF CONTRACTUAL PAYMENT OBLIGATION

17. KMS incorporates by reference and realleges herein the allegations set forth in Paragraphs 1 through 16 of its Counterclaim.

18. There is a genuine dispute between the parties as to whether KMS's advances to CustomerLinx constituted merely voluntary payments for the purpose of preventing a default by CustomerLinx in its performance of contractual obligations for Thomson or whether by commencing such advances KMS became contractually obligated to continue to do so for the remaining term of the Alliance Agreement.

19. KMS contends its advances to CustomerLinx of approximately $112,500 per month since March of 2003, in the absence of any agreement to further amend the Alliance Agreement, was completely voluntary and in response to CustomerLinx' requests for additional funds to assist it during a financial crisis and for the purpose of preventing a default by the Providers of their obligations under the Thomson Maintenance and Services Agreement.

20. KMS contends that its additional payments were made in reliance on CustomerLinx' representations of financial distress and the threat of imminent closure.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

21. Since there was no writing manifesting the mutual intent of the parties to make a binding agreement concerning the increased payments, and since there was no consideration for KMS' performance, KMS has no legal obligation to continue its increased payments and may legally revert to the original payment schedule in accordance with the Alliance Agreement, as amended, without breaching its agreement with CustomerLinx. Further, KMS is entitled to be reimbursed to the extent its voluntary advances previously paid exceed the amount due under the Alliance Agreement as amended

WHEREFORE, KMS requests that this Arbitrator determine as a matter of undisputed fact and as a matter of law that:

1. **An actual case or controversy exists between the Parties.**

2. **KMS has no legal obligation to make payments to CustomerLinx in excess of the amounts required by the Alliance Agreement and Amendment A.**

3. **KMS is entitled to a credit or reimbursement from CustomerLinx to the extent the sum** of its advances is greater than the amount due under the Alliance Agreement and Amendment A.

## II. DETERMINATION OF CONTRACTUAL DEFAULT

22. KMS incorporates by reference and realleges herein Paragraphs 1 through 21 of its Complaint for Declaratory Judgment as if more fully set forth herein.

23. Section 6(c) of the Alliance Agreement provides in pertinent part as follows:

> If CustomerLinx refuses a request by KMS to provide eCRM services to a KMS client under the terms of this Agreement, KMS will be free to offer eCRM Services to that KMS client in any manner of its choosing.

24. Section 6(d) of the Alliance Agreement provides in pertinent part as follows:

> If CustomerLinx fails... to provide contracted services to any KMS client, KMS may, after written notice to Customer Linx and a period of ten (10) business days to cure, be free to utilize other resources to provide eCRM services to the particular eCRM client until such time as CustomerLinx cures its failure.



MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

*mechanisms capture data real-time and will provide all requested reporting requirements, as well as other valuable data.'*

- There is currently no functionality for web-based reporting, nor, to the best of our knowledge, has CLX made any progress in meeting this contractual obligation.

3. **Disaster Recovery**

Page 17 of Exhibit A states: *'CustomerLinx will have the capability of transferring data or operating entire centers from a "remote-data" situation. An application and/or entire client operations can be moved or operated remotely via the VPN between the centers. The entire rollover time in such an event could be as low as 24 hours.'*

- CLX has failed to provide a short term or long-term disaster recovery solution, or a documented disaster recovery plan.

4. **Redundant Nature of Infrastructure**

Page 18 of Exhibit A states: *'Each LinxCenter uses the same or compatible technology, off-site storage of data back-ups, contains customer databases online in secondary LinxCenters, and, with the VPN, combine to provide protection against disaster. Tests of the backup power facilities, batteries and generator are scheduled quarterly.'*

- CLX has failed to meet any of these obligations.

5. **Technology**

Page 18 of Exhibit A states *'CustomerLinx agrees to keep their software and systems up to date, to maintain maximum efficiency. All major systems shall be V-2 or newer. Major systems comprise of operating system, I3 and BeCyber.'*

- Major systems have not been updated per the contract. Specifically, BeCyber is the installed version of v5.2.

- To date, there have been major revisions (v5.3 and v5.4) that would have improved performance dramatically.



MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

- Additionally, release v.5.5 has been published and current BeCyber version is 5.0. At minimum, the BeCyber system we should be operating with v5.4.

- We believe I3 is currently using v2.3, and yet we are still using v2.0.

6. **Other**

Paragraph 6 of Exhibit A (p. 10) states: *'Providers shall abide by and follow Client's practices, concerning but not limited to, security requirements computer and internet usage, etc.'*

- Security personnel that had been employed by CLX and billed to KMS as part of the management subsidy no longer exist."

[Emphasis in original.]

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

27. On December 21, 2004, KMS sent CustomerLinx notice pursuant to Section 6(d) of the Alliance Agreement in which KMS has notified CustomerLinx that it had failed to cure the defaults identified in the letter of October 21, 2004 and gave notice that absent a cure in full by CustomerLinx within ten (10) business days, CustomerLinx shall be foreclosed from objecting to KMS' retention of the services of another eCRM provider. A copy of the Section 6(d) Notice is attached hereto as Exhibit D.

28. To this date, CustomerLinx has failed to cure their breaches under Exhibit A of the "Scope of Work" Thomson Management Services Agreement and such failure has both jeopardized KMS' ability to perform under that agreement and placed in serious jeopardy KMS' business relationship with Thomson.

29. KMS' only hope of salvaging its relationship with Thomson is to obtain replacement contractor(s) capable of performing CustomerLinx obligations under the Thomson Management Services Agreement.

32. KMS should not be required to risk being in breach of its contract with CustomerLinx while at the same time it is obligated to engage and pay for replacement services to assure proper performance of the Thomson Management Services Agreement.

**WHEREFORE,** KMS respectfully requests that this Arbitrator determine that CustomerLinx is in material breach of the Thomson Management Services Agreement and that KMS may engage other eCRM providers, including its own services or that of affiliates or of unrelated third parties, to service Thomson and any other KMS or Kelly clients.

**Respectfully submitted,**

**MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.**

By: ______________________________
Allyn D. Kantor (P15687)
Attorneys for Respondent,
Kelly Management Services, Inc.
101 North Main, Seventh Floor
Ann Arbor, MI 48104
Telephone (734) 663-2445
Facsimile: (734) 747-7147

Dated: April 12, 2005

AALIB:434886.3\047265-00017

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.