UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
                              )
AKHIL C. GUPTA,               )
                              )
        Plaintiff,            )
                              )
                              )
        v.                    )         C.A. No. 03-587S
                              )
CUSTOMERLINX CORPORATION,     )
                              )
        Defendant.            )
                              )
```

## Amended Memorandum and Order

WILLIAM E. SMITH, United States District Judge.

Akhil Gupta ("Gupta" or "Plaintiff") brought suit against his
former employer, Customerlinx Corporation ("Customerlinx" or
"Defendant"), seeking money damages for fraud and breach of
contract. After a four-day trial, the jury returned a verdict in
favor of Gupta for fraud in the amount of $125,000 and for breach
of contract in the amount of $124,000. Before this Court are
Defendant's Renewed Motion for Judgment as a Matter of Law, or in
the alternative, Motion for New Trial[1], and Plaintiff's Motion to

---

[1] Customerlinx's Motion, filed pursuant to Fed. R. Civ. P. 50 and
59, is entitled, "Motion of Defendant for a New Trial or, in the
Alternative, for Judgment Notwithstanding the Verdict." (Def.'s
Mot. New Trial at 1.)  In 1991, Rule 50 was amended and the
terminology changed to refer to motions for a directed verdict and
motions for judgment notwithstanding the verdict as motions for
judgment as a matter of law. "If a motion is denominated a motion
for directed verdict or for judgment notwithstanding the verdict,

Alter, Amend and/or Correct Judgment to Add Prejudgment Interest. After careful review, this Court DENIES Defendant's Motion and GRANTS Plaintiff's Motion.

I.   Background

Customerlinx offers customer support services to businesses through its operation of call centers.   Pursuant to a letter agreement (the "Employment Contract") signed in December of 2000, Customerlinx, acting through its President, Jeffrey McDermott ("McDermott"), hired Gupta as Vice President of Marketing and Business Development, to begin employment on or about January 1, 2001.   The agreement provided in relevant part that Gupta would receive a base salary of $150,000 per year, plus a bonus described as follows:

> You will be eligible for a year 2001 bonus of up to $125,000 payable quarterly based on attainment of financial business plan objectives to be approved by the board.   Subsequent to 2001, you will also be eligible for an annual bonus equal to 100% of your base pay based [on] attainment of board approved business plan objectives and payable quarterly.

(Pl.'s Ex. 2 at 1.)

---

the party's error is merely formal.   Such a motion should be treated as a motion for judgment as a matter of law in accordance with this rule."   Fed. R. Civ. P. 50 advisory committee's note.   Consistent with Rule 50, as amended, this Court refers to Customerlinx's Motion as a "Motion for Judgment as a Matter of Law, or in the alternative, Motion for New Trial."

In connection with his negotiation of and entry into the Employment Contract, Gupta relied on five specific representations made by McDermott: (1) the company was "cash-flow positive," i.e., that each month, the company received more revenue than it expended in costs; (2) $6 million in new capital was expected, to be allocated in the amounts of $1.5 million to marketing, $1.5 million to sales, and $3 million to a new call center; (3) the bonus for which Gupta would be eligible would have two components, individual performance and company performance; (4) the bonus was "all but guaranteed"; and (5) the feature that distinguished the company from its competition, a "multi-modal technological platform," was then fully functional.[2]

Gupta joined Customerlinx on March 6, 2001, shortly after the $6 million in new capital had been received. Customerlinx never communicated to Gupta any financial business plan objectives to be attained in order for Gupta to earn a bonus, and its board never

---

[2] In addition to these five representations, Gupta adds a sixth: McDermott's statement that orders in hand in December 2000 achieved Customerlinx's year 2001 targets for revenue and profitability, even without addition of any new customers. "The truth," Gupta argues, "was that Customerlinx did not have such orders, but merely expressions of interest which never materialized into orders or sales." (Pl.'s Mem. Opp. New Trial at 6.) Based on Gupta's testimony at trial regarding this alleged misrepresentation (Tr., 4/25/05, at 118), together with Customerlinx's failure to dispute Gupta's argument (by way of Reply brief), this Court finds such misrepresentation to be supported by the weight of the evidence.

approved any bonus program.  On the contrary, the board determined that no bonuses would be awarded until the company became cash-flow positive.

Some time in April of 2001, Customerlinx merged its sales department into its marketing department and Gupta was made Chief Revenue Officer, with executive management responsibility for sales as well as marketing.  In an effort to penetrate the market for its services, Customerlinx entered into an "alliance" with Kelly Services, Inc. ("Kelly"), a global provider of staffing services. Under this alliance, Customerlinx provided technology, knowledge, and capital; while Kelly provided management, staffing, and business process discipline.  In June of 2001, Gupta was assigned to replace another employee, Joe Delaney, as the sales associate for the Kelly relationship.

In March of 2002, Customerlinx closed the sale of a contract for services with a company known as Thompson Consumer Electronics, or "RCA."  The contract was to be performed jointly by Kelly and Customerlinx under the terms of their alliance.  The contract provided for a five-year term with projected revenues to Customerlinx of approximately $6.2 million for the first twelve months.  Despite Gupta's request for a commission on the RCA sale, Customerlinx never paid Gupta such a commission.  On September 13,

4

2002, Customerlinx terminated Gupta's employment because it lacked the financial resources to pay his salary.

Gupta commenced this diversity-based action on December 16, 2003, seeking, among other things, damages for (1) fraud, based on an unpaid bonus to which he claimed he was entitled under the Employment Contract, and (2) breach of an express or implied contract resulting from an unpaid commission arising out of the RCA sale. After more than a year of litigation, the case went to trial on April 25, 2005. On April 27, 2005, following the close of Plaintiff's evidence, Customerlinx moved for Judgment as a Matter of Law,[3] asserting that Gupta's breach of contract claim was barred by the statute of frauds. Gupta objected, and this Court reserved judgment on the Motion. Following the close of all evidence that same day, Customerlinx renewed its Motion for Judgment as a Matter of Law. On April 28, 2005, the jury returned a verdict in Gupta's favor on both the fraud and breach of contract claims, awarding damages totaling $249,000. Judgment entered in this amount on May 6, 2005. On May 9, 2005, Gupta filed a Motion to Alter, Amend and/or Correct Judgment to Add Prejudgment Interest in the amount of $53,750 on the fraud claim, and $33,031 on the breach of

---

[3] In fact, Customerlinx moved for a "Directed Verdict." In keeping with the 1991 amendment to Rule 50 as discussed above, this Court refers to such motion as a "Motion for Judgment as a Matter of Law."

contract claim, totaling $86,781.  On May 16, 2005, Customerlinx
filed this Motion for Renewed Judgment as a Matter of Law, or in
the Alternative, Motion for New Trial.   On May 26, 2005,
Customerlinx filed an objection to Gupta's Motion to Add Prejudgment
Interest, objecting "<u>solely</u> to the extent the court has a pending
post-trial motion which should dispose of part or all of the
unamended judgment."  (Def.'s Obj. Am. J. at 1 (emphasis in
original).)

II.  <u>Standard of Review</u>

A district court may grant a motion for judgment as a matter
of law if "there is no legally sufficient evidentiary basis for a
reasonable jury to find for [the non-moving] party." Fed. R. Civ.
P. 50(a)(1); <u>see also</u> <u>Richards v. Relentless, Inc.</u>, 341 F.3d 35, 41
(1st Cir. 2003).

A district court's ability to grant a motion for new trial is
similarly circumscribed.   "District courts may set aside a jury's
verdict and order a new trial only if the verdict is so clearly
against the weight of the evidence as to amount to a manifest
miscarriage of justice." <u>Rivera Castillo v. Autokirey, Inc.</u>, 379
F.3d 4, 13 (1st Cir. 2004) (quoting <u>Federico v. Order of Saint
Benedict in Rhode Island</u>, 64 F.3d 1, 5 (1st Cir. 1995)).   While
"the district court has broad legal authority to determine whether
or not a jury's verdict is against the 'clear weight of the

6

evidence,'" <u>Ahern v. Scholz</u>, 85 F.3d 774, 780 (1st Cir. 1996) (quoting <u>de Pérez v. Hosp. del Maestro</u>, 910 F.2d 1004, 1006 (1st Cir. 1990)), the district court judge 'cannot displace a jury's verdict merely because he disagrees with it or would have found otherwise in a bench trial,'" <u>id.</u> (quoting <u>Milone v. Moceri Family, Inc.</u>, 847 F.2d 35, 37 (1st Cir. 1988)). "The mere fact that a contrary verdict may have been equally -- or even more easily -- supportable furnishes no cognizable ground for granting a new trial." <u>Freeman v. Package Mach. Co.</u>, 865 F.2d 1331, 1333-34 (1st Cir. 1988).

III. <u>Discussion</u>

   A.   <u>Jury Verdict was Supported by Weight of Evidence</u>

   Customerlinx argues that the jury verdict awarding damages to Gupta on the fraud and breach of contract claims was contrary to the weight of the evidence.

   1. <u>Fraud Claim</u>

   Customerlinx contends that the jury verdict in Gupta's favor on the fraud claim was contrary to the weight of the evidence, in part because there was no evidence of an intention or motive to deceive. Specifically, Customerlinx argues that McDermott did not misrepresent the financial condition of the Company when he stated that the Company was "cash-flow positive" as of December 2000, because "McDermott had no motive to deceive Gupta; there was

7

nothing special or unique about [Gupta's] candidacy to make him a hire critical to the company's success." (Def.'s Mem. Supp. New Trial at 10-11.)  While intent to deceive is certainly an element of the tort of fraudulent misrepresentation under Rhode Island law, see Fleet Nat'l Bank v. Anchor Media Television, Inc., 831 F. Supp. 16, 38 (D.R.I. 1993), Customerlinx chose to forego an instruction on this tort and opted instead for a negligent misrepresentation instruction, which does not require such a showing. [4]Negligent misrepresentation, which is "a species of the tort of deceit" (or fraud), Forcier v. Cardello, 173 B.R. 973, 987 (D.R.I. 1994) (internal citation omitted), requires a showing that: (1) the defendant made a false representation or provided false information concerning existing facts or circumstances; (2) the representation or information was false at the time it was made; (3) the defendant knew or should have known that the information was to be relied upon by the plaintiff in a business transaction; (4) the defendant failed to exercise reasonable care in obtaining or communicating

---

[4]    The record shows that while Gupta originally requested a fraudulent misrepresentation instruction which required a showing that "the defendant intended to deceive the plaintiff by inducing the plaintiff to rely on the false representation in entering into the transaction," Customerlinx objected to this instruction as being obviated by its own negligent misrepresentation instruction, which required only that "the defendant knew or should have known that the information was to be relied upon by the plaintiff in a business transaction." (Def.'s Obj. Pl.'s Jury Instr. at 4.)

the information in question; (5) the plaintiff relied on the false representation or information; (6) the plaintiff's reliance on the false representation or information was reasonable under the circumstances; and (7) the plaintiff suffered some financial loss or harm as a proximate result of the representation or information. (Jury Instr. at 20.) Customerlinx's reliance upon a lack of evidence of an intention or motive to deceive in support of its Motion is therefore unavailing. The weight of the evidence thus supports a jury's finding that McDermott's statement was a misrepresentation, regardless of whether or not he had an intention or motive to deceive.

Customerlinx also argues that the fraud verdict was contrary to the weight of the evidence because the alleged misrepresentations were true at the time they were made. According to Customerlinx, McDermott's statement regarding the allocation of $6 million in new capital was true when made, but by the time the capital arrived (four months later), Customerlinx's deteriorating financial state required the capital to be spent differently. Gupta contends that insofar as McDermott's statement was a forward-looking promise to do something, "the key issue is whether, at the time the statement of intention/promise was made, Customerlinx knew or should have known that it probably could not be performed." (Pl.'s Mem. Opp. New Trial at 4; see Jury Instr. at 23.)    In

9

December 2000, when McDermott made this statement, Customerlinx reported $4.1 million in negative cash flow for the year 2000, with $3.7 million in negative cash flow for January through November of that year. The weight of the evidence thus supports the jury's finding that McDermott misrepresented Customerlinx's intention to make such an allocation of new capital.

Customerlinx further argues that McDermott's statement that Customerlinx "[w]ould like to structure [a bonus plan] as [Gupta] suggest[ed]" was not a misrepresentation because it was true at the time it was made. [5]According to Customerlinx, "McDermott tried and failed to obtain the consent of the Compensation Committee on the Board of Directors both before and after Gupta's hire." (Def.'s Mem. Supp. New Trial at 11.) As Gupta points out, while the statement may have been true at the time it was made, McDermott's nondisclosure of subsequent board action which rendered his statements false amounted to a misrepresentation. (Pl.'s Mem. Opp. New Trial at 4; see Jury Instr. at 26.) Therefore, the weight of the evidence supports the jury's finding that McDermott

---

[5] Customerlinx denies that McDermott represented to Gupta that his bonus would have two components, individual performance and company performance.

10

misrepresented Customerlinx's intention to structure the bonus plan as Gupta suggested.[6]

In addition, Customerlinx contends that McDermott's statement that the "multi-modal technological platform" was fully functional was not a misrepresentation because it was true at the time it was made. As Gupta points out, while Customerlinx may have had such technology fully installed in several demonstration seats at two of its call centers, this technology was not implemented on a fully functional operating basis. In fact, according to Gupta, as of the date of his termination in September 2002, Customerlinx still did not have such technology in place. (Tr., 4/25/05, at 116.) McDermott's statement was therefore a half-truth, requiring further disclosure to prevent the statement from being misleading. (Pl.'s Mem. Opp. New Trial at 5; see Jury Instr. at 25.) In the absence of a corrective statement, the weight of the evidence supports the jury's finding that McDermott misrepresented that Customerlinx had a fully functional "multi-modal technological platform."[7]

---

[6]   Customerlinx also argues that McDermott did not know the statement was false at the time it was made, and did not intend to deceive Gupta. Because these findings are not elements of the tort of negligent misrepresentation as discussed above, this Court need not address them.

[7]   Customerlinx argues, and Gupta does not dispute, that since McDermott never stated that Gupta's bonus was "all but guaranteed" (Tr., 4/26/05, at 74), there was no misrepresentation as to this point. Assuming, without deciding, that McDermott made no such misrepresentation, this does not mean that the jury verdict in

11

Lastly, Customerlinx argues that Gupta proved no loss or harm resulting from his reliance on the alleged misrepresentations.  As Gupta points out, the evidence at trial clearly supports a finding that Gupta suffered loss of bonus incentive compensation owed to him.

### 2.   Breach of Contract Claim

Customerlinx contends that the jury verdict in Gupta's favor on the breach of contract claim was contrary to the weight of the evidence, because there was no contract (or quasi-contract) for sales commissions on the RCA sale under any of the four theories proffered by Gupta.  In the first place, Customerlinx argues that there was no express, written agreement between the parties for sales commissions.  Gupta disputes this, asserting that there was an email sent by McDermott in the fall of 2001, stating that sales commissions would be paid to any employee who made a sale, regardless of whether or not they were officers.  As Gupta notes, "although Customerlinx failed to produce this document in discovery . . . the existence of the document was amply proved by testimony

---

Gupta's favor is against the weight of evidence.  On the contrary, as Gupta points out, it is not necessary that the plaintiff prove each and every one of the alleged misrepresentations -- "[p]roof of any one was sufficient to support the verdict on the misrepresentation claim."  (Pl.'s Mem. Opp. New Trial at 3.)

of both McDermott and Gupta." (Pl.'s Mem. Opp. New Trial at 8; Tr.,
4/25/05, at 151; Tr., 4/26/05, at 152.)

As for an oral agreement, Customerlinx asserts that McDermott
categorically denied agreeing to a sales commission for the RCA
sale, and notes that Gupta testified that there was no "meeting of
the minds" between himself and McDermott regarding such an
agreement. (Def.'s Mem. Supp. New Trial at 13; Tr., 4/26/05, at
116.) Gupta, however, testified that there was an express oral
agreement reached in February 2002 with McDermott, in New York,
that Gupta would be entitled to a sales commission if the sale of
the RCA contract were closed. (Tr., 4/26/05, at 3.) Although
Gupta testified that there was no final agreement from McDermott as
to the percentage rate for the commission, a reasonable fact-finder
could have filled such a gap in the agreement based on evidence of
Customerlinx's customary practice. (Pl.'s Mem. Opp. New Trial at 8;
see Jury Instr. at 48-49.) Furthermore, although Gupta testified
that some question remained as to whether the commission would be
paid in cash or stock options, Gupta also testified that this
question arose in late March 2002, after the agreement for a sales
commission had been made and after the close of the RCA sale.
(Tr., 4/26/05, at 23.)

As for a contract "implied in fact," Customerlinx argues that
Gupta could not point to any course of dealings wherein a corporate

13

officer of the Company had ever received a commission payment. Gupta, on the other hand, points to Customerlinx's customary practice of paying a sales commission on every sale, and the stipulation that Customerlinx paid a sales commission on every sale except the RCA sale. (Tr., 4/27/05, at 81.) Customerlinx further argues that since Delaney, Gupta's predecessor as head of the Sales Department, was not entitled to a sales commission, Gupta was not entitled to such a commission when he took over Delaney's position in mid-2001. Gupta points out, however, that Delaney would have been entitled to a sales commission after having been demoted to sales associate. Therefore, when Delaney resigned in June 2001 and Customerlinx assigned Gupta to replace him as the sales associate for the Kelly relationship and the RCA deal, Gupta was entitled to a commission.

Finally, Customerlinx argues that Gupta's salary, benefits, and stock options were adequate consideration for his work on the RCA sale and therefore, he did not confer any benefit upon Customerlinx for which he was entitled to compensation under the doctrine of unjust enrichment. As Gupta argues, the weight of the evidence supports a finding that the sales position to which McDermott assigned Gupta after Delaney's resignation was not contemplated by the Employment Contract, and therefore was not covered by the Contract's existing compensation terms.

B.   Jury Verdict was not Excessive

Customerlinx argues that the damages awarded by the jury with respect to both the fraud and breach of contract claims were excessive.

1.   $125,000 Damages Award for Fraud

Even assuming that Customerlinx made misrepresentations regarding payment of a bonus, Customerlinx argues that Gupta was not entitled to $125,000 -- the equivalent of the maximum allowable bonus for 2001.   This Court disagrees.   Because Gupta worked for Customerlinx well past 2001, a reasonable fact-finder could have found that Gupta was entitled to a (prorated) bonus for 2002 as well, thereby potentially far exceeding the $125,000 amount awarded by the jury.   The jury's damages award on the fraud claim was therefore not excessive.

2.   $124,000 Damages Award for Breach of Contract

Customerlinx argues that the jury award of $124,000 on the breach of contract claim was excessive, in light of the fact that the gross revenue to Customerlinx for its portion of the RCA sale for the first twelve months totaled only $600,000.   A 3% sales commission [8] n $600,000, Customerlinx argues, yields only $18,000 --

---

[8]   According to Customerlinx, sales managers were eligible for commissions in the range of 1-3%.   (Def.'s Mem. Supp. New Trial at 7.)

15

not $124,000. As Gupta argues, the evidence shows that the total gross revenue on the RCA sale for the first twelve months was $6.2 million -- not $600,000. (Pl.'s Ex. 29.) Customerlinx admits as much, stating that "for some reporting purposes, Customerlinx 'booked' the gross revenue received by Kelly although it never received it as actual revenue, or cash." (Def.'s Mem. Supp. New Trial at 8.) Based on $6.2 million in gross revenue, the jury's award of $124,000 -- or 2% of such revenue -- was not excessive.

C. <u>Breach of Contract Claim for Unpaid Sales Commission is</u>
<u>Not Barred by Statute of Frauds</u>

Customerlinx argues, in the alternative, that Gupta's breach of contract claim for an unpaid sales commission is barred by the statute of frauds and thus, the verdict is not supportable as a matter of law. The Rhode Island Statute of Frauds, R.I. Gen. Laws § 9-1-4, provides, in relevant part, that "No action shall be brought . . . to charge any person upon any agreement which is not to be performed within the space of one year from the making thereof . . . unless the promise or agreement . . . shall be in writing, and signed by the party to be charged therewith . . . ." Customerlinx contends that Gupta's Employment Contract contemplated a two-year employment term covering the years 2001 and 2002, and thus could not have been fully performed within one year. Therefore, Customerlinx argues, the Employment Contract, together

with any subsequent modification of that contract, was required to be in writing pursuant to the statute of frauds. While Customerlinx does not dispute that Gupta's Employment Contract was in writing, Customerlinx argues that the alleged modification of that written contract, supposedly giving Gupta management responsibility for sales as well as marketing, fails under the statute of frauds because it was made orally.

Gupta argues that, even assuming his claim for a sales commission is based upon an oral modification of the written Employment Contract, Customerlinx's reliance upon the statute of frauds is misplaced. This Court agrees. Under Rhode Island law, a contract of uncertain duration and terminable at the will of either party is not within the statute of frauds, because it "could by possibility [be] fully performed within a year from the time it was made." Powless v. Pawtucket Screw Co., Inc., 352 A.2d 643, 646 (R.I. 1976); see id. (holding that oral agreement "for an indefinite term, terminable by either party at will" was not obnoxious to the statute of frauds, even though "the time of performance could have been, and indeed was, extended by the parties beyond a year"); see also Restatement (Second) of Contracts § 130 cmt. a (1981) (stating that "[c]ontracts of uncertain duration are simply excluded" from statute of frauds).

17

Here, Gupta's Employment Contract references an annual bonus
"[s]ubsequent to 2001" but contains no fixed term, and explicitly
provides that "employment will continue as long as is mutually
agreeable." (Pl.'s Ex. 2 at 2.) The Employment Contract is
therefore not within the statute of frauds. See Greene v. Harris,
1870 WL 2483, at *5 (R.I. 1870) (holding that oral agreement of
uncertain duration, which "expressly state[d] that it was 'to
continue as long as the parties are mutually satisfied,'" was not
required to be in writing under statute of frauds). It follows
that the subsequent modification of the Employment Contract (i.e.,
to include management responsibility for sales) need not satisfy
the statute of frauds. See Putnam Foundry & Machine Co. v.
Canfield, 56 A. 1033, 1033 (R.I. 1904) (holding that where "the
written contract in question was not within the statute of frauds
. . . it was clearly competent for the parties thereto to modify it
by a subsequent oral agreement"). The cases relied upon by
Customerlinx are inapposite to this case. Ferrera v. Carpionato
Corp., 895 F.2d 818 (1st Cir. 1990), and Wagniere v. Dunnell, 73 A.
309 (R.I. 1909), involved employment contracts for a definite term
in excess of one year (two and three years, respectively), and were
therefore held to be within the statute of frauds. See Ferrera,
895 F.2d at 821 ("a contract for a definite term longer than a year
is not excluded from the operation of the statute of frauds because

18

it contains a provision enabling either party to put an end to the contract within a year") (emphasis added) (quoting Wagniere, 73 A. 309).  Hicks v. Aylesworth, 1882 WL 3826 (R.I. 1882), and Ladd v. King, 1849 WL 1993 (R.I. 1849), both of which involved the attempted oral modification of a real estate contract within the statute of frauds, are likewise unavailing.  See Hicks, 1882 WL 3826, at *4; Ladd, 1849 WL 1993, at *4.[9]

D.   Pre- and Post-Judgment Interest

A district court sitting in diversity must apply the law of the state in which the court sits in determining whether and how much pre-judgment interest should be awarded.  Fratus v. Republic Western Ins. Co., 147 F.3d 25, 30 (1st Cir. 1998).  Both parties agree that if Customerlinx's Renewed Motion for Judgment as a Matter of Law, or in the alternative, Motion for New Trial, is denied, Gupta is entitled under R.I. Gen. Laws § 9-21-10 to pre-judgment interest on the awarded damages at a rate of twelve percent per

---

[9] So long as the oral modification of the written agreement occurs subsequent to the making of the contract, there is no parol evidence problem (which "renders inadmissible any evidence of prior or contemporaneous [but not subsequent] collateral agreements aimed at altering, varying or contradicting a written document in the absence of fraud or mistake").  Indus. Nat'l Bank v. Peloso, 397 A.2d 1312, 1314 (R.I. 1979); see also Fischer v. First Chicago Capital Markets, Inc., 195 F.3d 279, 282 (7th Cir. 1999) ("the parol evidence rule applies only to agreements made prior to or contemporaneous with the signing of a written contract; it does not bar evidence tending to show later modifications of the contract").

annum "from the date the cause of action accrued." [10]This Court agrees, finding "no compelling reason to ignore the directive of the statute" in this case. Buckley v. Brown Plastics Mach., LLC, 368 F. Supp. 2d 167, 170 (D.R.I. 2005).

In Buckley, this Court noted that "[t]he applicable case law (both state and federal) interpreting § 9-21-10, provides no clear answer" as to when a cause of action "accrues" for purposes of awarding pre-judgment interest. Id. at 169. In that case, the Court held that pre-judgment interest began to accrue on the date the cause of action was filed, noting that it was not possible "to accurately determine, based on the jury's verdict, the precise moment Plaintiff was originally entitled to the[] funds." Id. at 172. Had "the dates of the plaintiffs' onset of actual damages [been] clearly identified," this Court indicated that a different approach, i.e., one based on the date the plaintiff actually began to suffer damages, may have been appropriate. Id. (citing Blue Ribbon Beef Co., Inc. v. Napolitano, 696 A.2d 1225, 1229 (R.I. 1997) (holding that point of accrual of pre-judgment interest under § 9-21-10 was date plaintiff suffered damages from lost profits)).

---

[10]   R.I. Gen. Laws § 9-21-10(a) provides, in relevant part: "In any civil action in which a verdict is rendered or a decision made for pecuniary damages, there shall be added by the clerk of the court to the amount of damages interest at the rate of twelve (12%) per annum thereon from the date the cause of action accrued, which shall be included in the judgment entered therein.

Here, the dates of the Plaintiff's onset of actual damages are clearly identified and, significantly, are not in dispute.   The facts of this case therefore distinguish it from <u>Buckley</u>, and counsel in favor of awarding pre-judgment interest based on "the date from which Plaintiff's damages actually began, or put another way, from the point at which he was entitled to his money, and did not receive it."   <u>Id.</u> at 171.

As Gupta points out, with regard to the fraud claim, "the bonus payments would have been due quarterly, pro rata, at the end of the last three quarters of 2001, respectively." (Pl.'s Mem. Supp. Mot. Amend at 2.)   Pre-judgment interest on the fraud claim, calculated from those respective dates through April 30, 2005, is $53,750.   <u>Id.</u>   As for the sales commission claim, Gupta notes that "payment was due when the respective revenues were received." (<u>Id.</u>)   Pre-judgment interest on the claim for a sales commission, calculated from the dates of receipt of the respective payments, is $33,031.   <u>Id.</u>   Pre-judgment interest on both claims through April 30, 2005, is $86,781 ($53,750 + $33,031).   Gupta's Motion is therefore granted, and the judgment is amended to add pre-judgment interest in the amount of $87,182 (which includes interest on the fraud and sales commission claims for the first five days of May, prior to issuance of the judgment on May 6, 2005).

21

Post-judgment interest is governed by federal law rather than the Rhode Island statute. <u>Buckley</u>, 368 F. Supp. 2d at 173-74. In diversity actions, post-judgment interest is calculated at the federal rate, pursuant to 28 U.S.C. § 1961. [11]Based on the procedures set forth in § 1961, post-judgment interest shall be calculated at the rate of 3.33 per cent per annum.

IV. <u>Conclusion</u>

For the foregoing reasons, the Court hereby ORDERS as follows:

1.   Defendant's Renewed Motion for Judgment as a Matter of Law, or in the alternative, Motion for New Trial is DENIED;

2.   Plaintiff's Motion to Alter, Amend and/or Correct Judgment to Add Pre-judgment Interest is GRANTED;

3.   The amended judgment shall be $336,182; and

---

[11]   28 U.S.C. § 1961 provides, in relevant part:

(a) Interest shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding. [sic] the date of the judgment. The Director of the Administrative Office of the United States Courts shall distribute notice of that rate and any changes in it to all Federal judges.
(b) Interest shall be computed daily to the date of payment except as provided in section 2516(b) of this title and section 1304(b) of title 31, and shall be compounded annually.

4.   Any post-judgment interest shall be calculated at 3.33% and pursuant to the procedures detailed in 28 U.S.C. § 1961.


IT IS SO ORDERED.

_____
William E. Smith
United States District Judge
Date: 8/26/05